COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Petty and Huff
Argued by videoconference

**PUBLISHED**

REBECCA JONES RICHARD

v.      Record No. 1722-19-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
DECEMBER 8, 2020

FROM THE CIRCUIT COURT OF FLOYD COUNTY
Marcus H. Long, Jr., Judge

Gary M. Bowman (Gary M. Bowman, Attorney at Law, on briefs),
for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


On October 2, 2018, a grand jury for the Circuit Court of Floyd County ("circuit court")

indicted appellant Rebecca Jones Richard ("Richard") on one count of:  conspiracy to distribute a

controlled substance, in violation of Code §§ 18.2-248 and 18.2-256; and possession with intent

to distribute a controlled substance, in violation of Code § 18.2-248(C).

On appeal, Richard assigns error to the circuit court's denial of her motion to strike the

conspiracy charge because, she argues, "the evidence proved only that a single buyer-seller

transaction occurred."  Similarly, she assigns error to the circuit court's refusal to instruct the

jury "that a single buyer-seller transaction may not constitute a conspiracy."

## I.  BACKGROUND

On June 14, 2018, Matthew Harris ("Harris"), an acquaintance of Richard's, arranged

through text messages with "Mike from Willis" to trade a total of four "8-balls" of

methamphetamine, which is approximately half an ounce, for a Pontiac automobile.

Unbeknownst to him, "Mike from Willis" was actually Investigator Michael Wade ("Investigator Wade") of the Floyd County Sheriff's Office. Investigator Wade began texting Harris using that alias two months prior. Although Investigator Wade did not actually have a car to trade, he was trying to get Harris to meet up with him to effectuate a sting operation because "Harris was wanted on some other charges" and the sheriff's office "had received information that he was actively avoiding law enforcement." Harris and Investigator Wade agreed to meet the next day, June 15, 2018, at a Dollar General to make the exchange.

On June 15, 2018, Harris and Investigator Wade negotiated the "price" of the car again through text messages and settled on three 8-balls instead of four. At the time, one 8-ball sold for about $250 to $350. The same day, Harris contacted Richard "about purchasing some dope." Richard told him that she did not have any methamphetamine for him to buy because the police raided her home several weeks earlier and "all of the dope was seized." Harris let Richard know that he had a car available for her to buy. Harris told her that the owner of the car wanted "dope in return." Because Richard did not have any methamphetamine, Harris was going to "front" her the drugs to trade for the car, and as she got money from selling her personal items on Facebook and her social security disability income, she would pay him back in cash. Until she paid him back, Harris would "own half the car." Harris bought the methamphetamine from another dealer and then went to Richard's house.

At Richard's house, Harris showed her the text messages from Investigator Wade. Richard and Harris then developed a plan for making the trade. Richard only had $250 in cash, so she and Harris agreed that she would pay Harris the $250 as a down payment unless the owner of the car was not satisfied with the three 8-balls. If the owner of the car wanted more for it, Richard would contribute the $250 to the purchase "price." Typically, Harris would transport drugs to a deal by storing them in the hood of his car. This time, however, he asked Richard to

hold on to them and she agreed. Furthermore, Richard would drive to the deal because Harris did not have a valid driver's license. She and Harris agreed that if the person they were meeting up with tried to rob Harris, Richard "was to drive away and pick Harris up later." After developing this plan, Richard, Harris, and Richard's friend Jeffrey Lee ("Lee") rode together to the Dollar General. Richard asked Lee to come and check out the car because she did not "know a lot about mechanics."

When the three of them arrived at the Dollar General, Investigator Wade was surprised because he expected Harris to come alone. Immediately, Investigator Wade recognized Harris. Investigator Wade was waiting across the street in an unmarked car and texted Harris that he was "five minutes out." Right after Investigator Wade sent the text, Harris looked down at his phone. A few minutes later, Investigator Wade and two other deputies arrested Richard, Harris, and Lee.

After being placed under arrest and informed of her Miranda rights, Richard "pretty quickly" told the deputies that she had "like a quarter [ounce] and then another ball" of methamphetamine in her bra "to purchase a vehicle." The weight of the methamphetamine on Richard's person was consistent with three 8-balls. Richard told Investigator Wade, in detail, about her agreement with Harris earlier to trade the methamphetamine for the car. Prior to that day, Investigator Wade had never spoken with Richard or negotiated any price with her.

On July 9, 2019, the circuit court held a jury trial. At the trial, Investigator Wade testified to his agreement with Harris to trade the methamphetamine for the car. He also testified about what Richard told him regarding her plan with Harris to make the exchange. At the close of the Commonwealth's evidence, Richard moved to strike the conspiracy charge because, she argued, the Commonwealth's evidence only established a single narcotics transaction, which was insufficient to sustain a conspiracy to distribute the methamphetamine. The circuit court denied the motion. Specifically, the circuit court held,

-3-

Richard wanted a car. Harris knew she wanted a car. Harris talked to Investigator Wade and wanted to know if he still had a car. So Richard goes with Harris and . . . she knew that he was delivering dope to buy the car. So she knew that, that's your conspiracy. She wanted a car, she knew that Harris was getting the car with the dope. As a matter of fact, she went even so far as to possess and transferred the dope herself in her bra. And the car went to her. So this isn't a single buyer, single seller. Richard knew Harris was giving dope, according to your argument, to buy the car. And at that point, that's your conspiracy.

Richard then testified on her own behalf and corroborated the same story she told Investigator Wade after he arrested her. At the close of the defense evidence, Richard renewed her motion to strike. The circuit court denied the motion again, stating,

They were planning a get away in case the deal went sour, that's what she said. . . . [I]n any event, she knew that they were coming to Floyd to obtain this car from basically an unknown person, Mr. Harris brought her, and the deal was that they were going to . . . purchase it with meth, and possibly the cash that she had, that that was part of their conversation and that she transported the meth on her person up here and they also . . . planned a get away in case they got robbed or something, and that was for her to take off with the meth and come back to get him. . . . [I]t's more than seller/buyer.

Richard proffered two jury instructions that explained that a simple drug transaction cannot constitute a conspiracy. The Commonwealth objected that the facts of the case did not support the instruction. Richard responded "that the jury is entitled to be instructed on it. It's their call[] or should be their call as to whether this was a single buyer/seller relationship." The circuit court denied the instruction because the facts did not "show that in this case." Accordingly, the circuit court did not give any instructions regarding the application of conspiracy liability in a simple drug transaction.

The jury subsequently found Richard guilty of conspiring to distribute a controlled substance and possession with intent to distribute a controlled substance. Based on the jury's

-4-

recommendation, the circuit court sentenced Richard to a total of ten years' imprisonment and one year of post-release supervised probation. This appeal follows.

## II. ANALYSIS

### A. Sufficiency of the Conspiracy Evidence

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." Linnon v. Commonwealth, 287 Va. 92, 98 (2014) (quoting Lawlor v. Commonwealth, 285 Va. 187, 223 (2013)). The elements of each offense are a question of law that we review *de novo*. Id. (quoting Lawlor, 285 Va. at 223). However, "[w]hether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." Id. (quoting Lawlor, 285 Va. at 223-24). "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." Id. (quoting Lawlor, 285 Va. at 224). "After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Lawlor, 285 Va. at 224).

To establish a conspiracy to distribute a controlled substance, "the evidence must support a finding that [the appellant] and at least one other person conspired to possess the [drugs] with" the intent to sell or otherwise distribute them. Edwards v. Commonwealth, 18 Va. App. 45, 48 (1994). A conspiracy is "an agreement between two or more persons by some concerted action to commit an offense." Zuniga v. Commonwealth, 7 Va. App. 523, 527 (1988) (quoting Wright v. Commonwealth, 224 Va. 502, 505 (1982)). "In order to establish the existence of a conspiracy, as opposed to mere aiding and abetting, the Commonwealth must prove 'the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting.'" Id. That is, "[t]he agreement is the essence of the

-5-

conspiracy offense." Id. at 527-28 (quoting Amato v. Commonwealth, 3 Va. App. 544, 553 (1987)). Accordingly, when two or more persons "by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to effect that object." Charity v. Commonwealth, 49 Va. App. 581, 586 (2007) (quoting Brown v. Commonwealth, 10 Va. App. 73, 78 (1990)).

The conspiracy is complete when the parties form the agreement to commit the offense, "regardless of whether any overt act in furtherance of commission of the substantive offense is committed." Johnson v. Commonwealth, 8 Va. App. 34, 38 (1989) (citing Ramsey v. Commonwealth, 2 Va. App. 265, 270 (1986)). A party can join the conspiracy at any time and need not be a co-conspirator from the inception of the criminal plan to be found guilty of conspiracy. See id. at 39. Here, it is not consequential that Harris already planned to make the trade with Investigator Wade prior to Richard's involvement, nor is it consequential that Richard and Harris entered the conspiracy the same day the deal was set to take place. Thus, although Richard relies on the fact that Harris arranged to trade the methamphetamine for the car before she became involved, that fact does not preclude a finding that she and Harris conspired to distribute the methamphetamine.

"Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes." Iannelli v. United States, 420 U.S. 770, 777 (1975). However, a legal principle generally referred to as "Wharton's Rule" recognizes an exception to the common law of conspiracy. Wharton's Rule essentially states that where the substantive offense requires the involvement of more than one criminal agent and the agreement between them is no broader than accomplishing the substantive offense, the parties cannot also be punished as conspirators absent legislative intent to the contrary. Stewart v. Commonwealth, 225 Va. 473, 478 (1983). The Rule

-6-

applies where "[t]he parties to the agreement are the only persons who participate in the commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large." Iannelli, 420 U.S. at 782. "The reason for the [R]ule rests on the nature of the crime of conspiracy, which attempts to punish combination in crime which generates criminal activity 'not confined to the substantive offense which is the immediate aim of the enterprise.'" Stewart, 225 Va. at 478 (quoting Iannelli, 420 U.S. at 778). Put simply, "absent legislative intent to the contrary, the Rule supports a presumption that . . . [conspiracy and the substantive offense] merge when the substantive offense is proved." Id. at 479 (alterations in original) (quoting Iannelli, 420 U.S. at 785-86).

Additionally, at common law, the members of a conspiracy shared the same overarching criminal intent. See Ocasio v. United States, 136 S. Ct. 1423, 1429 (2016) ("[C]onspirators must 'pursue the same criminal objective . . . .'" (quoting Salinas v. United States, 522 U.S. 52, 63 (1997))).

However, our simple drug transaction jurisprudence[1] acknowledges Wharton's Rule and also recognizes an additional difference unique to drug transactions. Unlike co-conspirators, the parties to such a drug transaction do not share the same intent—one intends to possess contraband while the other intends to distribute it. Thus, although generally "a single buyer-seller relationship, *standing alone*, does not constitute a conspiracy," a conspiracy can exist based on a simple drug transaction if a two-step test is met. Zuniga, 7 Va. App. at 529 (emphasis added).

---

[1] Although our case law refers to this exception to conspiracy liability as a "single buyer-seller relationship," we think it more accurately refers to a simple drug sale transaction, particularly since we have also held it applies to two buyers in a single transaction. See Edwards, 18 Va. App. at 48.

"The first step is whether 'the seller knows the buyer's intended illegal use'" and thus shares his intent; "the second step is whether the seller 'intends to further, promote, and cooperate in' the buyer's venture." Edwards, 18 Va. App. at 48 (quoting Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943)). Although the test is somewhat inaccurately stated as "a vertical transaction, i.e. one between a seller and buyer, rather than a horizontal one, i.e. one between two buyers" or two sellers, the principles of the test may also be applied to a transaction between two buyers or two sellers. Id. If the drug transaction meets both prongs of the test, the participants share the same overarching criminal intent and the conspiracy is complete.

The simple drug transaction rule acknowledges that, although a simple drug transaction involves at least two or more criminal agents, the transaction does not *necessarily* create a conspiracy. If the transaction is spontaneous, the criminal enterprise lacks the shared intent, preconcert, and connivance that the law of conspiracy is meant to deter, there is no conspiracy.[2]

However, a simple narcotics transaction can still give rise to a conspiracy. See id. at 48-49. If the participants agree and plan to commit the crime in advance of the transaction such that the transaction is not spontaneous and share the same criminal objective, they are guilty of

---

[2] "[A] conspiracy poses distinct dangers quite apart from those of the substantive offense." Iannelli, 420 U.S. at 778. In addition to the completion of the substantive offense, concerted action from multiple criminal agents

> both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed.

Id. (quoting Callanan v. United States, 364 U.S. 587, 593-94 (1961)).

conspiracy regardless of whether it is ever consummated. Put differently, though there is obviously at least an implicit agreement to buy or sell drugs in any simple drug transaction, if the agreement to make the exchange occurs at essentially the same time as the transaction itself, the transaction is sufficiently spontaneous to conclude that the participants did not share the same intent and engage in preconcert and connivance, there is no conspiracy. A simple drug transaction is marked by spontaneity, while the essence of conspiracy is an agreement at least somewhat in advance of the transaction. In most instances, the presence of these factors or their absence are inferred from the circumstances. See James v. Commonwealth, 53 Va. App. 671, 678 (2009) (noting that due to the "clandestine nature" of conspiracy, most conspiracies are proved by indirect and circumstantial evidence since "[i]t is a rare case where any 'formal agreement among alleged conspirators' can be established" (citation omitted)).

In the case before us, however, direct evidence supported a finding that Richard and Harris had an explicit, pre-conceived plan to distribute methamphetamine. Richard knew of Harris's intent to distribute the methamphetamine in exchange for the car. See Edwards, 18 Va. App. at 48 ("When one buyer knows that the other buyer intends to possess the substance with intent to distribute it, the first step in the test is met."). She also cooperated in the venture and expected to share in the proceeds of the distribution by becoming a co-owner of the car until she could pay Harris back. See id. at 46 (finding evidence that "the defendant expected to share in the proceeds of the accomplice's sale" supported conspiracy conviction).

Prior to the meeting to make the trade, Richard and Harris developed a detailed plan that Richard would drive them to the pre-determined location, hold the methamphetamine on her person, and, if Harris got robbed, she would drive away but return later to pick him up. Additionally, prior to the meeting the two determined that if "Mike from Willis" wanted more than three 8-balls for the car, Richard could contribute the $250 she had on her in cash. From

-9-

these facts, a rational trier of fact could have found the elements of shared intent, preconcert, and connivance in a plan to distribute methamphetamine, thereby concluding that Richard and Harris conspired to distribute methamphetamine in exchange for a car. Accordingly, the circuit court did not err in denying Richard's motion to strike.

## B. Jury Instructions

"We review a [circuit] court's decision to refuse a jury instruction for abuse of discretion." Payne v. Commonwealth, 65 Va. App. 194, 203 (2015) (citing King v. Commonwealth, 64 Va. App. 580, 586 (2015) (*en banc*)). However, we review *de novo* whether a jury instruction accurately states the relevant law. Id. Our "sole responsibility" in reviewing jury instructions "is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." King, 64 Va. App. at 586-87 (quoting Molina v. Commonwealth, 272 Va. 666, 671 (2006)). In determining what issues the evidence fairly raises, "we view the evidence in the light most favorable to the proponent of the instruction." Id. at 583.

"A defendant is entitled to have the jury instructed only on those theories of the case that are supported by [more than a scintilla of] evidence." Id. at 587 (alteration in original) (quoting Eaton v. Commonwealth, 240 Va. 236, 255 (1990)). Whether credible evidence amounts to more than a mere scintilla "is a matter to be resolved on a case-by-case basis" by evaluating the evidence in support of a proposition against other credible evidence that negates it. Id. "'If a proffered instruction finds any support in credible evidence,' however, 'its refusal is reversible error.'" Id. (quoting McClung v. Commonwealth, 215 Va. 654, 657 (1975)).

In a jury trial, because the jury, not the court, is the arbiter of the credibility of the evidence, if there is evidence that tends to sustain either the Commonwealth's theory or the defense's theory of the case, the circuit court must instruct the jury as to both theories "to guide a

-10-

jury in their deliberations as to the law applicable to the case, depending upon how the jury decides the facts." Id. (quoting Foster v. Commonwealth, 13 Va. App. 380, 383 (1991)).

Here, Richard proffered two instructions regarding the simple narcotics transaction rule in conspiracy liability. The first read, "A single buyer-seller relationship, standing alone, does not constitute a conspiracy." The second read:

> A single buyer-seller relationship may constitute a conspiracy only if:
>
> (1) the seller knows the buyer's intended use; and
>
> (2) that by the sale, the seller, intends to further, promote and cooperate in the venture.

Both proffered instructions accurately state the rules adopted in Zuniga and were submitted to the circuit court with a proper citation to that case.[3] The question then is whether the simple drug transaction theory, viewed in the light most favorable to Richard, was supported by more than a mere scintilla of credible evidence.

On appeal, the Commonwealth argues that there was not more than a scintilla of credible evidence to support the instruction because "there was a specific and detailed arrangement and agreement." However, that conclusion depends on the credibility of the witnesses and the weight given their testimony. As noted above, the evidence, if viewed in the light most favorable to the Commonwealth, is legally sufficient to establish Richard's involvement in a criminal conspiracy. However, whether a properly instructed jury would view the facts in that light is an open question since they were not instructed that the nature of the transaction and the degree of

---

[3] Although the second jury instruction slightly misquotes Zuniga, which laid out the first step of the test as "the seller knows the buyer's intended *illegal* use," 7 Va. App. at 529 (emphasis added), that slight misquotation does not change our analysis. Moreover, the Commonwealth does not contend that the proffered instructions were incorrect and, in fact, conceded at oral argument that the proffered instructions were correct statements of the law.

-11-

Richard's involvement in it *might*, though not necessarily would, make a difference in her criminal liability for conspiracy. Thus, the circuit court's refusal to give the proffered instructions was error.

### III. CONCLUSION

For the reasons stated, we hold that from the evidence, viewed in the light most favorable to the Commonwealth, a rational trier of fact could have concluded that Richard and Harris conspired to distribute methamphetamine, and therefore we affirm the circuit court's denial of the motion to strike. However, we also hold that viewing the evidence in the light most favorable to Richard, there was more than a scintilla of evidence to support the proffered instruction such that the jury should have been given the opportunity to determine if the evidence supported its application to the facts as weighed by the them.[4] Accordingly, we reverse the judgment of the circuit court with respect to Richard's conviction for conspiracy to distribute a controlled substance and remand for a new trial, if the Commonwealth be so advised.

Affirmed in part, reversed in part, and remanded.

---

[4] The standards of appellate review are very different in the assignments of error before us and mandate this result. In considering the sufficiency of the evidence in this case

> a reviewing court must consider *all* of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause . . . and the overwhelming majority of appellate courts considering the question have agreed. The basis for [this] exception to the general rule [of remanding for a new trial] is that a reversal for insufficiency of the evidence should be treated no differently than a trial court's granting a judgment of acquittal at the close of all the evidence. A trial court in passing on such a motion considers all of the evidence it has admitted, and to make the analogy complete it must be this same quantum of evidence which is considered by the reviewing court.

Lockhart v. United States, 488 U.S. 33, 41-42 (1988) (emphasis added). See also Code § 19.2-324.1.